THE BANK OF THE REPUBLIC, Plaintiff in Error, *v.* THE COUNTY OF HAMILTON, Defendant in Error.

ERROR TO HAMILTON.

Corporations are artificial persons, created with limited powers and capacities, and subject to the general laws and legislation of the State, as natural persons are; rights secured to them by contract they cannot be deprived of without just compensation; but, like natural persons in the exercise of their rights of organization and existence, they are subject to the control of the legislature by general laws.

Bank of the Republic *v.* County of Hamilton.

If, by the act creating it, a corporation has, by express grant or necessary intend-
ment, rights and powers secured to it, such rights and powers are its property,
and are protected under the constitution like the property of an individual.

The general rights and powers of a corporation, and which are not intended to be
secured to it as its property, are subject to legislative control in the same man-
ner as the general rights of individuals.

Whenever a property is asserted in a right, whether the right is inherent in an
individual, or has been conferred by grant upon an artificial person, if the legis-
lature has relinquished the power to legislate further in reference thereto, the
property is fixed and absolute.

In the construction of statutes it will never be presumed that the legislature intend-
ed to abandon its rights as to the mode of assessing and collecting the State
revenues.

In submitting a plan for banking to the people, it was not intended thereby, to re-
lease any legislative power necessary for revenue purposes. The mode of assess-
ing the property of banks for the purposes of taxation, was not required to be
submitted to the people, and their vote did not confer any additional sanction
upon that provision ; the legislature still controls the mode of taxation.

Bonds deposited with the auditor to secure the redemption of the bills issued by
the banks, are subject to taxation.

THIS cause was brought into the Circuit Court of Hamilton
county by appeal from the County Court, from a hearing had in
the County Court on application, by the Bank of the Republic,
for a reduction of the assessment of the property of the said
bank, as made by the assessor of Hamilton county for the year
1857, the County Court having refused to reduce said assess-
ment.

In the Circuit Court the cause on appeal was heard before
BEECHER, Judge, at the May term, 1858, of the Hamilton Cir-
cuit Court, without a jury, and the judgment of the County
Court was affirmed.

On the trial in the Circuit Court, it appeared in evidence,
from the assessment lists of Hamilton county, that the valuation
of the personal property of said bank for the year 1857, was
four hundred and forty-two thousand dollars, which valuation
was entered in said lists in the column headed " *Bonds, Stocks;*"
there was not any noting on the said lists, of the words, " by
assessor," in any way connected with the bank.

That the assessor of Hamilton county called upon the agent
of the bank, (the president, etc., being absent,) in June, 1857,
for a statement of the property of the bank for taxation, when
it was agreed that such statement should be furnished by the
first of September. That the assessor did not leave with the
agent of the bank any blank to be filled. That said agent, in
August, 1857, mailed through the post office to said assessor a
statement of the property of said bank, signed by the president
thereof, which stated the capital stock of said bank paid in, at
fifty thousand dollars.

That it appeared from the testimony of Charles H. Rockwell,

the president of said bank, that the amount of capital stock thereof paid in at that time was fifty thousand dollars; that there was not any surplus profits, reserved funds, personal property, or real estate belonging to said bank, beyond said fifty thousand dollars; that said bank then had bonds and stocks deposited with the auditor, as a basis of issue for the circulating notes of said bank, to the amount of four hundred and six thousand dollars, and that the amount of circulating notes of said bank was four hundred and three thousand dollars; that the balance due upon the purchase of said bonds, when procured, was paid in the notes issued by said bank; that said bonds deposited draw interest; that said bank had, on the 1st April, 1857, thirteen thousand dollars in specie on hand. That after the passage of the act of 1857, amendatory of the general banking law, the auditor demanded proof of said bank that fifty thousand dollars of actual cash capital had been paid in, or secured to be paid in, to said bank. That there is no other or further cash capital paid in, or secured to be paid in, to said bank, than said fifty thousand dollars.

The Circuit Court fixed the valuation of the bank at four hundred and nineteen thousand dollars.

Thereupon the counsel on the part of said bank, and the counsel for the defendant (Hamilton county,) had the case certified to this court, upon the following agreement signed by them:

"We do hereby agree, in the case of The Bank of the Republic versus The People of Hamilton County, that the following questions and points of law arising in the said cause may be submitted to the Supreme Court of the State of Illinois, for final judgment and determination; and that no further action be taken or further proceedings had in the said cause, until the opinion of the said Supreme Court shall be first had thereon.

"1st. Whether the said assessment of plaintiff's property for the year 1857 was not invalid, for the reason that the assessor did not comply with the provisions of the statutes of the State of Illinois, in not leaving the notice and blank required by law for the listing of property, and in not making any note or memorandum of the date and name as required in such cases, and not noting the words, 'by assessor,' in the assessment lists, against the name of the plaintiff.

"2nd. Whether there was any such neglect or refusal on the part of the plaintiff to list property, as the law contemplates, in order to authorize the assessor to value the property independently of the owner.

"3rd. Whether said assessor was not bound to accept the statement of the property as listed by the president of said bank, on being notified that it was ready for him at the clerk's

office, before closing his assessment list, and before entering therein any valuation of said property.

" 4th. Whether said statement of the order was sufficient authority for said assessor to enter the valuation of the property of said bank, without further information or inquiry.

" 5th. Whether the assessor had any legal authority to assess bank property at all.

" 6th. Whether the provision of the law is not compulsory, requiring a reduction of the assessment to the valuation fixed by the person required to list, when verified by the oath of such person, on applying for such reduction.

" 7th. Whether the bonds or stocks deposited with the State auditor, as the basis of issue of said bank, are taxable as personal property of said bank.

" 8th. Whether said stocks so deposited, are the measure of the capital stock of said bank, and liable to taxation according to their market value.

" 9th. Whether the act of 1857, amendatory of the general banking law, makes the *bona fide* cash capital of said bank actually paid in, or secured to be paid in, the basis of taxation for said bank.

" 10th. Whether the term ' capital stock paid in,' as employed in the sixth section of said amendatory act, is to be construed as synonymous with the term ' *bona fide* cash capital actually paid in,' as it occurs in the eighth section of said act.

" 11th. Whether the ' capital stock paid in, or secured to be paid in,' as used in said sixth section, means the investment of moneys other than the proceeds of the notes of issue of the bank, whether in purchase of real estate, coin, stocks deposited, or any other property belonging to the bank.

" 12th. Whether the bank officer, in listing the property of the bank as required by law, is bound to include in such list, the stocks deposited by the bank, estimated according to their market value, together with the coin on hand and also the actual cash capital paid in, other than the proceeds of its own circulating notes, as well as any surplus profits and reserved fund in the bank.

" 13th. Whether, if said stocks deposited are required to be listed as capital stock, together with the coin, *bona fide* cash capital paid in, surplus profits and reserved fund, the bank may not deduct from the aggregate amount thereof, the true amount of its outstanding circulation.

" 14th. Whether the basis for taxation for banks, under the said amendatory act of 1857, is the same with that for individuals and other corporations or associations, namely, the actual value of property which they own ; and in estimating such value,

whether they are allowed, in listing property, to deduct from the gross amount of moneys and credits owned, the amount of *bona fide* debts owing, in the same manner as other persons or corporations.

"15th. Whether the said amendatory act of 1857, in imposing additional burthens upon the banks, without any corresponding advantage or benefit conferred, and not authorized at the time of the passage of the general banking law in its adoption by the people, is not wholly null and void, and in conflict with the constitution of the United States, as impairing the obligation of contracts.

"16th. Whether an appeal lies to the Circuit Court, from the decision of the County Court, on the refusal of an application to said court to reduce the valuation of property as assessed by the county assessor.

H. T. Steele, for Plaintiff in Error.

N. L. Freeman, for Defendant in Error.

Caton, C. J. Two principal questions are raised by the appellant in this case, which have demanded our careful consideration. The first is, whether the bank can object to the change made by the law of 1857, in ascertaining the value of the property of the bank, on which it is to be assessed, from that provided by the general banking law, under which this bank was organized; and, second, whether the bonds deposited with the auditor to secure the issues of the bank, are taxable, or rather, whether the bank is taxable to the amount of these bonds, as capital paid in, or secured to be paid in.

The tenth section of the general banking law of 1857, says: "Taxes shall be levied on and paid by the corporation, and not upon the individual stockholders; the value of the property to be ascertained annually by the bank commissioners herein provided for, and the rate of taxation shall be the same as that required to be levied on other taxable property, by the revenue laws of the State." This was the provision of the original banking law, approved by the vote of the people, and under which this bank was organized. The sixth section of the amendment of 1857 is this: "The capital stock of every bank or banking association, paid in or secured to be paid in, except so much thereof as is invested in real estate, which shall be taxed as real estate, as herein provided, together with its surplus profits or reserved fund, and also the real estate of such company, shall be listed by the president or cashier thereof, and assessed and taxed in the same manner as other personal and

real estate of the county and towns in which such bank or bank-ing association is located." This is the change in the law to which the bank makes objection as a violation of its chartered rights; and also as a violation of this provision of the constitu-tion—" No act of the General Assembly, authorizing corpora-tions or associations with banking powers, shall go into, or in any manner be in force, unless the same shall be submitted to the people at the general election next succeeding the passage of the same, and be approved by a majority of all the votes cast at such election for and against such law."

The objection that this change in the mode of ascertaining the value of the taxable property of the bank from the valuation of the bank commissioners to that of the president or cashier of the institution, implies that by this provision in the general bank-ing law the State has entered into a solemn contract with all the banks which should be ever thereafter organized under that law, that that mode and none other should ever be adopted for ascertaining the value of the taxable property of the bank; and this very objection implies that all banks and all other corpora-tions are above and independent of, all laws except only their charters. That no general law affecting the revenues, or the police, or in any way the general good government of the State, can be passed unless its charter so provides.

Corporations are artificial persons endowed with limited pow-ers and capacities, and are subject to the general laws and leg-islation of the State, the same as natural persons. The natural man is born with sovereign power and unlimited rights, if he be beyond the limits of governments and societies; upon entering these, a portion of his rights are sacrificed, against his consent if he objects, either to a greater or less extent, as good gov-ernment may be deemed to require. It would be absurd to suppose that the powers of government are greater over the rights of the being endowed by the Creator, than over the one spoke into existence by human laws. Government may enter into contracts with either, and by these contracts it must be bound, but no more so when the contract is entered into with a person of its own creation, than with a natural person. This obligation imposed upon government to observe and be bound by its contracts, is imposed by our federal and state constitu-tions, and these constitutional provisions were inserted in order that we might be relieved from the oppressions of an absolute government. An absolute government may deprive all its sub-jects, whether natural or artificial, of all rights, and even of being. To this very day the absolute power is claimed and ex-ercised by the British parliament, and there is no compact ex-isting between the people and the government in that free and

enlightened country, protecting the subject against the concentrated powers of the state. Society here might have been organized conferring upon government the same absolute powers over the citizen or subject, but happily, restrictions were adopted, curtailing these absolute powers, which experience has shown, left the hands of power sufficiently strong to govern this people.

The trouble has been in considering what the legislature may and may not do with corporations of its own creation, that we have too much lost sight of the distinction between those powers which are secured to them by contract and those which are mere endowments of existence. The former are their property, of which they cannot be deprived without just compensation ; the latter are elements of existence, imparted to them by the law of their being, and are held by them like the natural rights of the natural person, subject to be controlled and modified by the legislature, the same as it may control and modify the natural endowments of the natural person. It may not be easy at all times to distinguish between those rights which are secured by the contract contained in their charter, and those powers which are conferred upon them as capacities or elements of their being. Indeed the judicial mind has not to any great extent been led to inquire into this distinction, but it has been mostly occupied in defending and maintaining those rights which are secured by what is called this legislative contract, and it has required all the weight of the judicial department of the government to protect these rights against the encroachments which have been sometimes attempted by the strong arm of the legislature. While we must be unyielding in resistance to such encroachments whenever attempted, we must not forget that these artificial beings must be subject to government and subordinate to legislation, precisely the same as an individual or natural person.

If in a law creating an artificial being, rights or powers are conferred upon it, which, by the express terms of the act or by reasonable intendment, shall not be taken away or modified by a subsequent law without the consent of the corporation, that becomes what has been termed a charter contract, and becomes a property in the hands of the corporation, and is protected by those constitutional provisions referred to ; but unless there be such express provision or reasonable intendment that such right or faculty shall not be touched by subsequent legislation, it is held in the same subordination to governmental control to which the rights and faculties existing in natural persons are subject. Suppose an act passed creating a corporation and conferring upon it the same powers, faculties and capacities of natural

persons, and there stops. We cannot conceive of greater powers than would be conferred on that corporation, and yet as there would be no express or implied contract that it should be above legislative interference, the law-making power could subject it to the same control that it could a natural person. So again, should a law be passed declaring that a certain individual should enjoy a right exclusively, which he had formerly possessed in common with all men, or should thereafter enjoy a right of which he had, in common with others, been deprived, and the law, in express terms, or by fair intendment, should guarantee the enjoyment of such right, perpetually, that would be a contract with the legislature which would vest in him a property in such right, in which he would be protected to the same extent and in the same way that the same right secured in the same manner to a corporation would be protected. Whenever, therefore, a property is asserted in a right, whether it be a right inherent in a natural person or conferred by law upon an artificial person, the first inquiry presented is, has the legislature renounced the power to legislate further upon such right, or subject it to further legislative control ? If so, then a property is secured ; if not, it is a naked right, which is subject to governmental regulation, the same as all other rights, which may be dealt with by the law-making power, as the public good may require.

Having thus stated some of the fundamental principles by which we must be governed in the present inquiry, let us return to the immediate question before us, and to which we must apply them. We have already quoted the provisions of the law of 1851, and the change made in the mode of determining the value of the taxable property of the bank, by the law of 1857. There it nothing in the former showing that the legislature intended to bind itself never to change the mode there provided for assessing the bank. The insertion of that provision in this law is no more indicative of an intention by the legislature to abandon the right to fix by law the mode of assessment, than as if the same provision had been inserted in another law. It has nothing to do with the powers or privileges of the banks to be incorporated under it. It is but a revenue measure, and of all other subjects we must presume that the legislature will barter away last, the right to regulate the mode of assessing and collecting the public revenue. The existence of the State depends upon her revenues, and the most vital interests of the community require that the legislature retain its power over the means and mode of raising its revenues ; and we cannot and ought not to presume that this right has been thrown away and

abandoned, or relinquished beyond recovery by the legislature, unless the language of the law clearly indicates such intention.

The language of the law of 1851, is, " The value of the property to be ascertained annually by the bank commissioners herein provided for." From this is it to be inferred that the legislature contracted and agreed with the banks that no other mode should be adopted for the assessment of the property of the banks in all time to come ? We are not to presume that such was the intention of the legislature. The language conveys no such idea, and the subject matter at once forbids it. That the legislature might bind itself to a corporation or an individual to assess property in a particular mode consistently with the injunctions of the constitution, we will not deny, but in order to do so, negative words should be used, forbidding any other mode, or some consideration should be provided for the relinquishment of so important a right, or it should appear from some provision of the act, that it was the intention to grant the right to the party to have the value ascertained by that and in no other mode. This is a question of the construction of a statute, the object being to find out the real meaning of the legislature, which must be governed by the rules of construction applicable in such cases. The presumption is against the intention to abandon the right of the legislature to regulate by law the mode of assessing and collecting the revenue, and to overcome this presumption, we must find something in the law indicating such intention. There is nothing of that kind appearing in this law, and we hold that the legislature had and has the right to provide for the taxation of bank property the same as any and all other property.

The fact that the officers of the bank reported the list in conformity to the requirements of the act of 1857, shows that the bank had adopted its provisions as an amendment to its charter, and could not afterwards object to it as a violation of its chartered rights ; serves as another answer to this objection ; but we chose to consider the question of power in the legislature, and to vindicate that power upon what we believe to be sound and correct principles.

There is another objection, which is, that it is an amendment to the law of 1851, which was by the constitution required to be submitted to a vote of the people for their approval, before it could take effect, and it having been thus approved, it cannot be touched by the legislature alone. That it can only be altered or repealed by the same power, and through the same channel, which imparted to it vitality ; which made it a law. We have already quoted the provision of the constitution upon which this

provision is based. On the one hand, it is contended that by the adoption of this provision of the fundamental law, it was the intention of the people to reserve to themselves the right, not only to decide the question whether or not there should be any banks in the State, but also that they should determine what kind of banks they would have, the principles upon which they should be established, and the mode of their organization. In short, that the only power which they delegated to the legislature on the subject of banks, was to propose measures on this subject to the people, for them to adopt or reject,—that the people retained in their own hands a portion of the legislative authority, and constituted themselves a branch of the legislature upon this subject. On the other hand, it is contended that this law of 1851, when it received the sanction of the popular vote, became a law the same as any other law, subject to be amended or repealed by the legislature, as much so as if it had not been required to be submitted to a vote of the people, but had been passed by the General Assembly alone, in the ordinary way. That when the vote was once taken and the law approved, the office of that provision of the constitution was fulfilled, and as to that law at least; became a dead letter.

Without stopping to examine how far either of these positions may be maintained, we are clearly of opinion that some of the provisions of this law which was submitted to the people, are subject to legislative interference and control, and among them is the one in question. We may safely say, that the constitution did not require that the mode of assessing the property of the bank for the purposes of taxation, should be submitted to the people, and its submission to them was a work of supererogation. Had the bank law been silent on this question, and the same provision inserted in another law, it would have been as validly passed as it was after the vote in its favor. That vote gave to this clause no additional sanction. The subject of taxation and the revenue, are, by the constitution, placed in the hands of the legislature alone. Upon this subject they have complete jurisdiction to legislate independently of the popular vote, and such vote in approval of laws which might take effect without it, could not place the law beyond or above the jurisdiction of the General Assembly; so that we may safely assume that any provision in that law which might have been enacted by the General Assembly alone, is still subject to legislative control, without reference to a vote of the people. Such is the provision now under consideration.

There is one remaining question to be considered, and that is, whether the amount of bonds deposited with the auditor to

secure the redemption of the issues of the bank, is subject to taxation. Upon the power of the legislature to declare all rights and interests held within the State, property, and subject to taxation, we have fully expressed our views in the case of *The People* v. *Worthington, post,* and we shall not repeat them here. Of the authority of the legislature to impose the tax, we have no doubt, and the only real question is, have they done so? The passage from the law of 1857, has been already quoted. It says, the capital stock " paid in, or secured to be paid in," shall be assessed and taxed. The second section of the general banking law provides, that when any person or association shall transfer to, and deposit with the auditor, certain specified public stock, the auditor shall deliver to him or them an amount of bank notes, in blank, to an amount equal to the value of the bonds, to be issued by the bank for and as in lieu of money. The stocks thus deposited with the auditor are presented to him as the property of the bank, either purchased by the bank with its cash or credit, or that of the owners, and constitute the basis of its currency, and the fund from which its issues are ultimately to be redeemed, in case the bank does not voluntarily redeem them with other funds. It is not the business of the auditor, or of the State, to inquire whether the bonds were purchased with cash or on credit. That circumstance could not affect the title of the bank to the bonds when presented to the auditor, and at that moment they are the proper subject of taxation, as bonds. When they are transferred and delivered to the auditor, they constitute so much bank capital paid in. The title of the bonds is then vested in the auditor, for the trusts declared in the law. They then cease to be taxable as bonds, but the amount of their value becomes taxable as bank capital paid in. What is bank capital? It is a fund contributed, or to be contributed, by the shareholders or proprietors of the bank, and transferred by each to the aggregate association, upon and with which it is to transact business. It may be either loaned to its customers in specie, or deposited either in its own vaults or in some other place, where it may remain as a basis or security for the redemption of the bank bills which it may issue, and these bills are loaned to its customers or otherwise used, as and for money. If this law had required coin to be deposited and kept in the vaults of the bank instead of bonds in the hands of the auditor, to secure the redemption of the bills issued by the bank, would any one deny that the coin thus deposited was so much capital paid in? And if coin thus deposited in the vaults of the bank would be so much capital of the bank, it would be none the less so if deposited with the

auditor, or in any other hands ; and when stocks are substituted for coin, we are unable to appreciate any reason why they are not equally capital paid in. It seems to us that neither ingenuity nor sophistry can avoid this conclusion. At least, we can comprehend no reason why it is not so. We might go on with a tedious review of various provisions of this and the subsequent laws on the subject, showing that it was the manifest intention of the legislature that the bonds deposited with the auditor should be considered as so much capital paid in, as a basis for the banking operations of the institution, but we deem it entirely unnecessary. To us it seems so plain as to admit of neither question nor cavil.

We are of opinion that the judgment must be affirmed.

*Judgment affirmed.*